Q3 Investments Recovery Vehicle, LLC or the plaintiff, appellate, had the opportunity to conduct any discovery. At the time, this was before the New York State Court. The defendant below, Signature Bank, submitted evidence to support its motion to dismiss that was outside of the four corners of the complaint. And based on that evidence, which the appellate, plaintiff, Q3 Investments Recovery Vehicle had no opportunity to rebut with any of its own evidence because it was conducted. Specifically, what documents are you adverting to? Your Honor, the defendant in that case, Signature Bank, submitted an affidavit. They submitted the account application for the Q3... It was an unsigned account application, right? And the affidavit you're referring to is the MIMS affidavit? Yes, Your Honor. Okay. There were actually four different pieces of evidence that they submitted. One was the affidavit. One was the account application for the Q3-1 account, and that was executed. And it attached the LP agreement for Q3-1 to it. So that was the full account application. According to Signature Bank, of course, the recovery vehicle is not allowed to conduct any discovery. So the recovery vehicle has no idea what other account information was out there. Then there was also submitted a blank account application for a trust account. Again, according to Signature Bank, because the recovery vehicle has not been able to conduct any discovery on this. And then there was also a portion of an FDIC memorandum that was submitted in support of the motion to dismiss. How would any of this have converted the account from a deposit account to a fiduciary account? Your Honor, I believe that what the defendant, Signature Bank, was trying to do is establish based on this evidence that the account was not a fiduciary account. Correct. So they were, in the Plaintiff of Collins' recovery vehicle's opinion, those pieces of motion to dismiss. They do not, it is not all of the evidence that would presumably be available should the recovery vehicle be permitted to conduct its own discovery. Because, of course, the account records should include much more than just the account application. For example, we know that Q3-1 submitted its private placement memorandum, its subscription agreement, in addition to the other materials that the manager who opened the account had requested. So there should be more items in that account file, in that record, than just the account application. And that's one of the issues that I think is critical in this case because the issue really is that the recovery vehicle has not had the opportunity to discover what the bank, what Signature Bank actually knew, the knowledge that they have. And so what we have to look at on the evaluation of the motion to dismiss are the allegations in the complaint. Did the appellant recovery vehicle, in the complaint, make allegations that could support its claims for negligence and gross negligence? And the answer to that is yes. This was a well-pled complaint. And under 12b-6, because the New York State Court, of course, evaluated this based on New York law, after the FDIC's removal of this case to federal court, now we would proceed under 12b-6. Well, the allegation that a bank account is a fiduciary account is something of a legal conclusion. So I guess what are the allegations that support that? I mean, I understand that the general partner may have fiduciary duties to the limited partners, but I'm not sure how Q3I, the LP, the entity, has fiduciary obligations to the limited partners. And even if it does, I guess I'm not sure how a bank account, that turns a bank account, that by itself turns a bank account into a fiduciary account, which seems to be a specific type of account. Right, Your Honor. So in New York law, there is an exception to the general rule, the general rule being that generally a bank would not owe a duty to non-customers. There's an exception to this if there are three elements that are met, and that is that there is a fiduciary relationship that exists between the customer and the non-customer. The bank knows about the fiduciary relationship and has actual knowledge or notice of misappropriation. I'm asking about the first prong right now. Sure. So the fiduciary relationship we submit was clear based on the documents that would have been submitted along with the application. So, for example, the LP agreement, the subscription agreement, and the private placement memorandum. As far as I know, the only one that's in the record right now is the LP agreement, because, again, this was at a motion to dismiss stage and not everything was in. But those documents describe the relationship of the company and the board that was the general partner, which was a board of people that managed Q3 holdings, which was the general partner, and the relationship that all of the other limited partners had to this company, which was formed for one reason, and that reason was to marshal all of these assets on behalf of all of these limited partners into this cryptocurrency trading algorithm that Mr. Ackerman had allegedly developed to allow them to engage in high-frequency cryptocurrency trading. So the entire purpose of Q3-1, the formation of Q3-1, was to act as a fiduciary for these limited partners. Now, the general partner, Q3 holdings, also acted as a fiduciary. Q3 holdings also had accounts at Signature Bank. That's actually what flagged the compliance department's suspicions on this account activity, because it was contrary to what was stated in the documents for Q3-1 for how this account was supposed to operate, because the account was supposed to be swept every other day at least into and out of the cryptocurrency exchanges, and that never happened. The compliance department flagged the activity in this account because hardly any of the money was actually going into the cryptocurrency exchanges. Instead, it was going directly into the accounts of the general partner and then being distributed to the board members of the general partner and to their personal accounts, again, at the same bank. And so this activity raised the eyebrows, raised suspicions at the bank itself, and the bank itself indicated that the majority of the funds, this is a quote, the majority of the funds were being sent to the benefit of the three account signers. So there was some clear indication that there was suspicious activity going on, but the account manager reassured the general partner that all they needed to do was paper it, just provide me with some papers so that we can move on from this, presumably because this was a crypto-friendly approach by this bank, Signature Bank. They wanted the business that other banks were not taking such a risk on. They wanted to make sure that they got that business, and as a business decision, they decided to assume risks that other banks weren't willing to take. Ms. Jones, you've reserved three minutes of rebuttal time. Do you want to use some of it now, or do you want to wait and do it after we hear from the FDIC? I'll use the rebuttal time after the FDIC's argument. Thank you. Before you sit down, let me just ask one very quick question. Of this cast of individuals, Ackerman and Seoss and Tran, who's been prosecuted? Mr. Ackerman has been prosecuted. I believe that is in the record in this case. I don't think there's any other mention of anything else in the record in this particular case. And he's already been sentenced, correct? That is my understanding, although I don't know if his sentence or anything is in the record. Thank you. Thank you, Your Honor. May it please the Court. Duncan Stevens for the Federal Deposit Insurance Corporation as receiver for Signature Bank. The district court correctly dismissed the amended complaint for failure to state a claim because the account that Q3I held at Signature Bank was an ordinary deposit account. It was not a fiduciary account. This is shown by the account application that Q3I prepared and that Signature approved. And any idea, any notion that Q3I held fiduciary duties is refuted by the limited partnership agreement that Q3I executed and is not supported by the allegations of the complaint. Let me start with the account application. My friend has argued that the account application should not have been considered. But this Court recognizes that documents outside the complaint that are integral to the complaint may be considered, even if they're not cited in the complaint, even if they're not, even if they contradict the allegations of the complaint. And a contractual document is the paradigm of an integral document, of a document that's integral to a complaint. And this is a contractual document. This is the document that created the account that is at the heart of this. So if it's a contractual document, there's no reason not to consider it. There's every reason to consider it. I mean, when we consider contracts, that's usually when the contract is at issue. Absolutely. This is not really that scenario. You're trying to, I mean, your predecessor tried to admit this application to show the nature of the relationship between the bank or between the customer and the LPs. That seems a little bit different, a little bit, a step removed from something that's an integral to the complaint. I don't think so, Judge Park, because I think my, I think Signature and the FGIC agree this was, this was the document that created the account. The question is what type of account it created. So there is a presumption that when a... If that's a fact question that typically we go through discovery to... Well, sure. But I'm submitting that the face of this document supports the conclusion that this is an ordinary account, and it can be evaluated on its face to reach the conclusion that it was an ordinary account. In recognition of the presumption that an account at a New York bank is ordinary, the salient features of this document that point toward this conclusion are that nowhere does it indicate that Q3I will be acting as a guardian, a trustee, a custodian, what have you, someone holding funds for someone else's benefit. The beneficial owners are identified as the managers themselves, whereas a fiduciary account application, an agreement to create a fiduciary account must say this is for the benefit of so-and-so. Here the so-and-so, for plaintiffs to prevail, would have to be the plaintiffs themselves, and it points it exactly in the opposite direction by saying the managers are the ultimate beneficial owners. I guess I'm more interested in hearing your... Okay. I think I'm more interested in hearing your second point rather than the one that relies doubling down on the document that I think has, you know, questionable ability to... Sure. And this picks up on a point that you were referring to during the appellant's argument. The complaint rests on the theory, and when you look at complaint at paragraph 28 of the complaint, this makes it very clear. The complaint rests on the theory that Q3I held fiduciary duties to the plaintiffs, but it did not. Q3I was a limited partnership. Limited partnerships do not, as a matter of law, have fiduciary duties. And a limited partnership agreement here confirms that by providing that these limited partners purchased their shares. They parted with their funds in order to obtain shares in the limited partnership. And that is not a fiduciary model. That's an investment model. So there is no so Q3I, the limited partnership, was not holding funds, holding the limited partners' funds, managing their funds for them. They parted with the funds. They became Q3I's funds. And thereafter, it's as if, Your Honor, it's as if you were investing in Amazon. No one would say Amazon is holding your funds and trusts for you. So the allegations that the complaint rests on this theory that Q3I itself had fiduciary duties, and that's simply not legally correct. Let me ask you this. Suppose, hypothetically, the signature bank had actual knowledge of improper use of these funds. Would that not support a gross negligence claim against it? Signature's knowledge comes into play if this is a fiduciary account. Okay. So your position, if it's not a fiduciary account, if it's not a fiduciary account, but they still sat around and saw funds being misapplied and misappropriated, no liability, no exposure? Correct, Your Honor. And the reason is that, as to ordinary accounts, the courts have said there isn't such a duty. And the reason is that they're... Well, you certainly have no duty, maybe, to inquire. But let's say you know about it. What are your responsibilities then? You learn about it. Right. The duty kicks in for fiduciary accounts. And I'm just not aware of... There's no question the bank is stuck if it's a fiduciary account. But let's suppose it's an ordinary account, and you know that there is misappropriation going on. Your Honor, I'm not aware of case law supporting that kind of negligence theory as to an ordinary account, is all I can tell you, that all of the case law looks at the bank's duty where there is a fiduciary account. And whether there are — whether there's case law out there that skips over the duty — is not in the context of a duty to inquire, but is in the context of actual knowledge, I don't know. But the way this case was pleaded and argued has been about — has been based on the premise that there was a fiduciary account, and we don't think there was one. Suppose the officers at Signature Bank applied procedures to this account. These are pretty unusual accounts. This is the only bank in the world — not only the bank in the world. I mean, nobody was taking these kinds of deposits when Signature was. And you've got the bank's client was prosecuted and convicted. And then if you look at — suppose it was a — technically a deposit account, but Signature applied a level of diligence to it that it routinely only applied to fiduciary accounts. Would that change anything? No, Your Honor. And I think that the answer lies in ordinary principles of New York tort law, where there is not a preexisting duty under — as a matter of tort law, such a duty is assumed only when the defendant, the tortfeasor, the alleged tortfeasor, undertakes something that causes someone to rely on them. So — but there's no reason to think that happens. So if you, Your Honor — if there's a storm, let's say you have no duty to salt your sidewalk, but you put up a sign saying, salted sidewalk, safe to walk on, and people walk on that sidewalk, you've induced reliance, and you could be liable for violating the duty you've assumed. So if I'm a banker, your theory is that if I see misappropriation, mismanagement in this account, I have no — since it's a deposit account, I've got no responsibility to do anything else. Is that your theory? It's — since it's an ordinary account, I'm not aware of any case law that would impose a duty on the bank to stop that. What about common sense? Common sense. It's — it would certainly have been a good idea if that — if that happened for the bank, just as a matter of serving customers well for the bank to say something. But as to the existence of a tort duty, I don't think there is such a duty. So the bank officers, we're bank officers. We can sit around, you know, this — I see Ackerman scooped out another $350,000 last year and put it in his wife's account, but it's a deposit account, so no harm, no foul. Is that the FDIC's position? All right. I'd come back to what's required as a matter of State law for a State-chartered bank and which signature was. And there are — there's certainly a difference between what is prudent for a bank and, you know, ignoring clear evidence of misappropriation could be imprudent and could give rise to all sorts of consequences, but as a matter of State-tort law, and so consequences on a regulatory basis. The State regulators might have differences of that. The FDIC, as the deposit insurer, might have differences with reckless conduct like allowing misappropriation to go on. But as a matter of State law, I don't think State law imposes that duty. So — so your compliance — your — not your — I'm sorry — Signature's compliance department said — noted that, quote, the majority of the funds were being sent to the benefit of three account signers, unquote, contrary to the stated permissible uses of the Q1 account. And then one board member — I don't know if this is D'Amico — said, quote, I've spoken with Mr. D'Amico and he understands what we're doing. He just needs it on paper for his compliance team. Sounds to me that they — I mean, that's some suggestion. It may — maybe, you know, it's cryptic. We don't have context and so forth. But it seems to me that there's some suggestion here that the bank knew what was going on and needed to paper it over for compliance purposes. That may be wrong, but it seems to me those are legitimate questions to ask in a deposition.  I would — it's meant that it equally supports the conclusion that the compliance team is not going to take a third-hand account, you know — Is what? The compliance team is not going to take a third-hand oral account to explain what happens. It wants this written out on paper such that if this later turns out to be true — It doesn't protect itself. Well, sure. They're worried about something. They want protection about something. Or they're being prudent in saying we're not going to accept an explanation over the phone that you're later going to deny. So it can be interpreted in multiple ways, Your Honor. Absolutely. Absolutely. So — but we only reach this if there is a duty, and as we've discussed, we don't believe there is a duty as to this ordinary non-fiduciary account. Can I just ask one unrelated question? The district court case was removed to federal court, and the district court had to figure out what to do with this removed case and adopted the approach that's been used by the Fourth and the Ninth Circuit in addressing the state trial court judgment. I realize you didn't talk about this in your briefing, but I just wanted to ask, is the FDIC comfortable with that approach, or does it have any position on which among the various approaches the circuits have taken is preferable? We haven't addressed that issue. Well, the FDIC was present when this happened. So the FDIC was in agreement with the other side that the Fourth and Ninth Circuit's approach was acceptable. And under that approach, you know, the parties had the ability to raise post-judgment remedies if they wanted to, they weren't required to. So, I mean, we were okay with it there, and I don't know that we have a global preference. The Fifth Circuit has adopted a slightly different approach. So it's – it was something that we – that the parties agreed to here, and it seemed to be – it seems to be appropriate. Thank you, sir. Thank you. Okay. Thank you very much. And we ask the Court to affirm. We'll hear rebuttal. Thank you, Your Honors. So under New York law, the nature of whether that duty existed really turned on the – what the bank knew about the relationship. And I think there was an instructive case that was cited by the appellee, by the FDIC, and that was the Abrams case at 938 Federal 2nd 22. And it talks about the fact that you can have an ordinary deposit account that, based on other documentation in the file, in the bank's records, becomes a fiduciary account. So while there might be a presumption that the account application, for example, is one for a regular depository account, when you look at the actual records of the bank and all the other submissions that went along with the account application and opening the account, you can realize and understand that this is not actually a regular depository account, that it is, in fact, a fiduciary account. And that is precisely what happened here. It's the totality of the documents that were submitted in the process of opening this application that would put the bank on notice that this was a fiduciary relationship, that this was going to be a fiduciary. And specifically, which documents were those? Your Honor, that would be the private placement memorandum, the limited partnership agreement, and the subscription agreement, which were all submitted to Mr. D'Amico whenever this account was opened. Those were documents that he actually requested from Q3-1. So they were all submitted. And then there are additional questions that, again, we really need to see some discovery on to get to the bottom of what happened here, because we just don't know whether the fiduciary account application was even presented to Q3-1 when this was opened. We don't know the guidance that they received on which form they were supposed to fill out. All of those things would be coming up in discovery and depositions. We'd be able to test these questions that Your Honors have raised in the FDIC's argument. And that's really the reason why the appellant, Q3 Investments Recovery Vehicle, asked this Court to reverse so that Q3 Investments Recovery Vehicle has the opportunity to conduct discovery to try to determine what happened in this case and so that the Court can make a meaningful review of the facts of the case. And for all of these reasons, the Recovery Vehicle respectfully requests that this Court reverse and remand. Thank you, Your Honors. Thank you both, and we will take the matter under advisement.